

APR 1 1 2016

CLERK US ...
RIC...

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

UNITED STATES OF AMERICA

v.                                   Criminal No. 3:15cr170

MARCUS L. HARRIS
    a/k/a MARCUS LEE HARRIS, SR.

### MEMORANDUM OPINION

This matter is before the Court on Defendant's MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE (Docket No. 14). Having reviewed the papers, taken evidence, and heard oral argument, the Court concludes that: (1) there was a valid traffic stop; (2) even if the stop was an investigatory stop (rather than a traffic stop), the police officers had reasonable suspicion to stop the vehicle in which Marcus Harris ("Harris") was a passenger; (3) officers legally seized Harris' phone following the traffic stop; and (4) Harris does not have standing to challenge the search of his phone conducted pursuant to the search warrant issued on September 4, 2015. Therefore, the MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE (ECF No. 14) was denied by the Court's Order issued on March 8, 2016 (ECF No. 28).

### FACTUAL FINDINGS

In July 2015, a number of burglaries occurred in Colonial Heights, Virginia. (Transcript of March 7, 2016 ("Hrg. Tr.," ECF No. 29) at 6). One of those burglaries occurred on July 7, 2015, when three firearms and several items of jewelry were stolen from a residence located at 144 Carroll Avenue. Id. The firearms were: a .40 caliber Glock pistol, a .380 Walther semiautomatic pistol, and a .38 caliber revolver. Id. at 7. On July 11, 2015, Detective Thad Johnson ("Johnson") of the Colonial Heights Police Department ("CHPD") received a telephone call from the proprietor of a Colonial Heights jewelry store reporting that Stephan Adams ("Adams") (who was a suspect in the July 7 burglary) was attempting to sell some jewelry. Id. Shortly thereafter, Adams was arrested and admitted that he had stolen the firearms and the jewelry from 144 Carroll Avenue. Id. at 8-9. Adams also made several other statements against his penal interest, including admitting to other burglaries and to extensive drug use.

Adams reported that he had taken the stolen firearms to 404 North Carolina Avenue in the nearby City of Petersburg in an effort to sell them to a man named "Vice." Id. at 9. However, upon Adams' arrival at that address, Vice and a man named "Marcus" had robbed Adams of the firearms and his wallet. Id. That residence was occupied by the man Adams knew as "Vice,"

2

Tommy Williams ("Williams"), Williams' girlfriend, Mona, and Vice's mother. Id. at 12.

Johnson informed the Petersburg Bureau of Police ("PBP") of the information that Adams had provided and asked for assistance in obtaining and executing a search warrant for 404 North Carolina Avenue, where Adams had allegedly been robbed of the firearms and his wallet. Id. at 10. The search warrant was obtained and executed in the early morning hours of July 12. Id. Officers from the PBP effectuated the entry, and once the house was secured, Johnson and members of the CHPD and the PBP searched the residence. Id. at 10-11. However, the stolen firearms were not found. Id. at 12.

As the search was concluding, Johnson interviewed Williams and explained to him why his residence was being searched. Id. at 13. At that point, Williams admitted that he had seen Marcus Harris ("Harris") rob Adams of the firearms. Id.

Detective James Aponte ("Aponte") of the PBP also participated in the July 12 search of 404 North Carolina Avenue. After the search was concluded, Aponte spoke with Williams, gave him a business card, and asked Williams to telephone him in the event that Williams came in contact with Vice or Harris, or if he should learn of their whereabouts. Id. at 83. Aponte was aware from his communications with CHPD and his participation in

3

the search warrant briefing that Harris had been identified as
the perpetrator of the robbery of the weapons from Adams.  Id.

The next day, July 13, Aponte received a telephone call
from Williams advising that Harris would be meeting Williams at
Williams' residence, 404 North Carolina Avenue, that afternoon.
Id. at 84.  Aponte arranged for a surveillance perimeter to be
established at that location.  Id. at 85-86.  While Aponte was
awaiting Harris' arrival in a surveillance vehicle not far from
Williams' address, Williams again telephoned the PBP
headquarters to report that Harris would be a passenger in a
vehicle that Williams described as a gray Nissan.  Id. at 86.
Williams also said that there would be a weapon in the vehicle.
Id.  That information was promptly relayed to Aponte.  Id.

Shortly thereafter, Aponte observed a gray vehicle arrive
at 404 North Carolina Avenue.  Id. at 86-87.  Williams left the
house and entered the vehicle, which was then driven away.  Id.
Aponte advised his colleagues via radio that the car was a gray
Infiniti, at which time Detective Eric McCall ("McCall"), a PBP
officer and member of the perimeter surveillance team, spotted
the vehicle and began to follow it.  Id. at 60.  Not long after
that, the gray Infiniti made a turn without using its turn
signal at a stop sign.  Id. at 65.  McCall activated his
emergency lights and radioed to report the traffic infraction.
Id. at 63.  However, McCall mistakenly said that the vehicle

4

"did not use the stop sign," rather than reporting that the vehicle had failed to use a turn signal. Id. at 65.

Disregarding McCall's signal to pull over, the gray Infiniti continued to proceed at a slow speed. Id. at 65-66. Consequently, McCall activated his siren. Id. at 66.

McCall's experience in similar situations led him to believe that all or some of the occupants of the vehicle were preparing to flee on foot when the car came to a stop. Id. Using a tactical radio, McCall broadcast this apprehension to the other members of the surveillance team. Id. at 67-68. The Infiniti continued to proceed slowly north on Sycamore Street, turned right onto East Fillmore, and then turned onto Adams Street, where it finally stopped. Id.

Having been made aware by McCall that the vehicle was not responding to McCall's signals to stop, Aponte drove east on Mars Street, parallel to the course of the Infiniti. Id. at 88. Based on his previous experience, Aponte, like McCall, was of the view that the passengers in the car were getting ready to flee once the car came to a stop. Id. Aponte saw the Infiniti stop on Adams Street, whereupon, as both he and McCall had predicted, an occupant jumped from the rear of the vehicle and fled from the scene of the traffic stop, running down Adams Street toward Aponte, who was approximately one-half a block away. Id. at 90. Aponte apprehended that occupant, who was

5

subsequently identified as J'Quan Finch-Howard ("Finch-Howard"). Id. Aponte walked Finch-Howard back to the site of the traffic stop. Id. at 90-91.

Meanwhile, McCall was dealing with the occupants of the Infiniti who had not taken flight. Id. at 68-69. As McCall approached the vehicle, Harris (the front passenger) and Williams (the right rear passenger) stepped out of the car. Alone and mindful of the report that there was a gun in the car, McCall told Harris and Williams to lie down on the ground behind the car, at which time other officers arrived and placed both in handcuffs. Id. at 69-70. McCall then instructed the driver, Calvin Tucker ("Tucker"), to exit the car. Id. at 70-71.

When questioned, Tucker said that he had borrowed the vehicle from a relative. Id. at 91. Aponte then explained to Tucker that the police thought there would be a weapon in the vehicle and asked for permission to search it, which Tucker gave. Id. at 91-92. Aponte began to search and, just behind the center console, located a "fanny pack" containing a Glock semiautomatic pistol and two magazines. Id. at 93. Underneath the fanny pack, Aponte found a Jansport book bag containing a .22 caliber revolver, a .22 caliber survival rifle, and some .22 caliber ammunition. Id.

Having located a Glock and a revolver, and mindful that weapons of that description had reportedly been stolen by

6

Harris, who was a passenger in the Infiniti, Aponte telephoned Johnson (of the CHPD) and advised him that PBP had "found the Glock and the revolver that we [the CHBP and PBP] previously were searching for." Id. at 96. Johnson immediately came to the scene of the traffic stop. Id. at 97. Johnson took a quick look into the vehicle and, without taking any item out of either the fanny pack or the Jansport book bag, told Aponte that "those were the weapons they were looking for from a burglary."[1] Id.

After searching the Infiniti, Aponte saw two cell phones lined up on the curb, next to the individuals who had been in the vehicle. He picked up the cell phones and asked for the owners to identify them. Id. at 99. Williams claimed a flip phone, and Harris claimed a Samsung smartphone. Id.

The occupants of the vehicle, including Harris, were then taken to the PBP for questioning. Id. at 102. CHPD officers conducted all four interviews. Id. While there, Aponte spoke

---

[1] Aponte, using the VCIN database, ran the serial numbers of the weapons through the system to confirm that the weapons were the stolen weapons that CHPD was searching for. Id. at 97-98. The database returned a negative result, meaning either that the weapons had not been stolen or that they had not been entered into the VCIN system as of that time. Id. at 98-99. Johnson later learned that the guns in the car were not the ones that Harris had taken from Adams. However, Johnson never communicated that information to Aponte. In mid-September, after Aponte had obtained a second search warrant on September 4, Aponte learned from the Chesterfield County police that the weapons recovered from the Infiniti had been stolen from a residence in Chesterfield. Id. at 102.

7

again with Williams and asked who had possessed the bags that
had been found in the car.  Id. at 103.  Williams reported that
the fanny pack that contained the Glock had been in Harris'
possession, and asked whether Aponte had located the drugs that
were in the fanny pack.  Id. at 103.  Aponte had not, but
returned to further search the fanny pack, where he located the
drugs that Williams had said would be there.  Id.

Finch-Howard, the occupant who had fled from the rear seat
of the vehicle, corroborated Williams' statement that Harris had
possessed the fanny pack (containing the Glock and the drugs) at
the time that the Infiniti was being followed by the police car.
Id. at 107.  Finch-Howard also added that, once the lights of
the police car came on, Harris tossed the fanny pack into the
back seat toward Finch-Howard, where it was found in the search
(behind the center console).  Id.

Finch-Howard also told Johnson that there was a video on
Harris' cell phone that showed Harris shooting one of the stolen
weapons.  Id. at 38.  Johnson testified that thereafter he
advised Aponte that a video would be found on Harris' cell
phone.  Id.  Aponte did not recall being informed about the
content of the video, but did recall that Johnson had mentioned
the video.  Id. at 147.

In light of the information obtained from Williams and
Finch-Howard and Harris' presence in the car near where the

8

weapons and drugs were found, Aponte believed that he had probable cause to arrest Harris for possession of the drugs and stolen weapons found in the vehicle. <u>Id.</u> at 105-06. However, Aponte did not immediately place Harris under arrest. Instead, he retained Harris' cell phone with a view to obtaining a search warrant to search the contents of the phone. <u>Id.</u> at 107.

According to Aponte, criminals tend to take photos, often called "glamour shots" or "trophy photos," of items involved in their crimes (such as money, drugs, or guns). <u>Id.</u> at 108. In Aponte's experience, this practice occurs on a widespread basis; Aponte stated that he and his fellow detectives had investigated numerous cases in which individuals had taken "trophy photos" on their cell phones of weapons, drugs, money, or other evidence. <u>Id.</u> at 108-110. Both Aponte and Johnson testified that the pervasiveness of "glamour shots" or "trophy photos" is common knowledge among law enforcement officers. <u>Id.</u> at 27-29; 107-111.

As Harris was leaving the PBP after the questioning concluded, he asked Aponte to return the cell phone, but Aponte declined the request, explaining that he would be immediately seeking a search warrant for the phone's contents. <u>Id.</u> at 111-12. He advised Harris to telephone in a couple of days regarding the cell phone's return. <u>Id.</u> at 112. Upon the advice of the Attorney General's laboratory, Aponte powered the phone

9

off or put it into airplane mode so as to protect the phone's contents from being remotely wiped or otherwise destroyed. _Id._ at 110. The phone was then secured in the PBP property room pending application for a search warrant. _Id._

The next day, July 14, Aponte applied for, and received, a warrant to search the cell phone. Aponte then took the cell phone to the crime lab at the Virginia Attorney General's Office to have a professional conduct a forensic examination of the phone's contents. _Id._ at 113-14. On July 16, the Attorney General's forensic team informed Aponte that the telephone was password protected and that, at the time, the laboratory did not have the necessary software to access the contents of the phone. _Id._ Aponte returned the cell phone to the PBP's property room.

Meanwhile, Aponte's investigation into Harris' conduct continued, and, as part of that investigation, Aponte had obtained a search warrant for Harris' DNA. On July 20, Aponte served that warrant on Harris at Harris' home and obtained the DNA sample. _Id._ at 114-15. At that time, Aponte also asked Harris to provide the cell phone password so that the contents could be examined. _Id._ at 115. Aponte explained that, with the password, the search of the contents could be completed in a few days, whereas without the password, it could take up to 45 days. _Id._ at 115. Harris responded that the cell phone was not his

10

and that therefore Aponte would just have to wait the 45 days to find out what was on the phone. Id.

After Harris disclaimed ownership of the phone on July 20, he had no contact with Aponte or any other officer at PBP regarding the phone before Aponte obtained a second search warrant on September 4.[2] Id. at 117. Following the issuance of the second warrant, the state police lab was able to successfully access the phone's contents, and their forensic examination revealed a number of photographs showing the weapons that had been seized from the car and the scale that was in the fanny pack found in the car. Id. at 118. Examiners also found several videos on the phone, including one video depicting Harris handling the Glock 17 that had been seized from the Infiniti and another depicting Harris firing it. Id.

On September 16, Harris telephoned Aponte to ask for the return of the cell phone. Id. at 140. Harris advised that his wife would come to pick up the phone. Id. Aponte told Harris that his wife could have the phone after the state police lab returned the phone to PBP. Id.

---

[2] Obviously, there was a delay between July 14, 2015, when the first search warrant was obtained, and September 4, 2015, the date on which Aponte obtained the second search warrant. That delay occurred, according to Aponte, because he was waiting for the DNA sample to be returned, because of his heavy workload, and because Harris had "rejected ownership of the phone [on July 20]" and thus Aponte saw no urgency to get the search warrant right away. (Hrg. Tr. at 117).

## DISCUSSION

Harris makes several points in support of his motion to suppress the contents of the cell phone. First, Harris seems to argue that there was no legal justification to stop the Infiniti. (Motion to Suppress Illegally Seized Evidence ("Def. Mot.," ECF No. 14) at 5-6). Although Harris concedes that a traffic violation would constitute sufficient reason to initiate an investigatory stop, he suggests that a traffic violation actually did not occur. Id. at 5. Second, Harris argues that "law enforcement did not have a legal basis to seize and keep the Samsung phone." Id. at 6. Third, he argues that both search warrants obtained by Aponte were deficient for lack of probable cause. Id. at 7-8.

The United States defends the traffic stop as valid. (Government's Response in Opposition to Motion to Suppress Illegally Seized Evidence ("Gov. Resp.," ECF No. 18) at 10-11). It also contends that Harris has no standing to challenge the search warrants because he abandoned the cell phone on July 20, when he denied ownership of the phone. Id. at 10. And, it defends the warrants as supported by probable cause. Id. at 13-14.

## A.   The Stop Of The Vehicle

Harris does not dispute that an officer may stop a vehicle when he has probable cause to believe that a traffic violation,

12

however minor, has occurred.   See Whren v. United States, 517
U.S. 806, 812-13 (1996).   It is well-settled that "[a] driver's
failure to use a turn signal provides probable cause to justify
a traffic stop irrespective of the officer's subjective intent."
United States v. Jackson, 682 F.3d 448, 453 (6th Cir. 2012)
(collecting cases).

Harris makes a half-hearted attack on the validity of the
traffic stop because, although McCall testified that he made the
traffic stop for failure to use a turn signal, he told his
fellow officers over the radio that the stop was made because
the vehicle had failed to "use" a stop sign.   (Hrg. Tr. at 63-
65).   McCall acknowledges that, in so doing, he erred.   Id. at
65.   The Court accepts McCall's testimony that he made an honest
error in communication and finds that the traffic stop was made
for failure to use a turn signal, and thus finds that McCall had
probable cause to make the traffic stop.

The papers and argument disclose that Harris' real
objection to the vehicle stop is that the stop was an
investigatory stop conducted without reasonable suspicion that
criminal activity was afoot.[3]   Thus, says Harris, the stop did
not comply with the dictates of Terry v. Ohio, 392 U.S. 1
(1968).

_____

[3] As explained above, the Court finds that there was a valid
traffic stop, and thus the discussion on this point is an
alternative one.

13

Under Terry, "an officer may conduct a brief investigatory stop where the officer has reasonable suspicion that criminal activity may be afoot." United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004) (citations omitted). Reasonable suspicion is "simply a particularized and objective basis for suspecting the person stopped of criminal activity." Ornelas v. United States, 517 U.S. 690, 696 (1996) (internal quotation marks omitted). It "is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence [even though] [t]he Fourth Amendment [still] requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

If viewed as an investigatory stop (rather than a valid traffic stop), the predicate for the stop would appear to be information provided by Adams and Williams. Harris casts both as informants or "tipsters." Regardless of whether Adams and Williams are characterized as informants or merely witnesses to criminal activity, the information that they provided must be reliable to meet the requisites of Terry. United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004). To that end, the Court will measure their reliability as Harris urges, i.e., as if they were informants.

14

"In cases where an informant's tip supplies part of the basis for reasonable suspicion, we must ensure that the tip possesses sufficient indicia of reliability." Perkins, 363 F.3d at 323. "Where the informant is known...an officer can judge the credibility of the tipster firsthand and thus confirm whether the tip is sufficiently reliable to support reasonable suspicion." Id. Moreover, a known informant "can be held responsible if her allegations turn out to be fabricated." Florida v. J.L., 529 U.S. 266, 270 (2000). Verifiable innocent details (such as the color of the defendant's vehicle) and prediction of future behavior (such as the correct prediction of a particular route taken by the defendant at a particular time) are also indicia of reliability, because such details demonstrate "a special familiarity with [the defendant's] affairs," which in turn imply that a tipster has "access to reliable information about that individual's illegal activities." Alabama v. White, 496 U.S. 325 (1990).

Harris bases his Terry argument on the contentions that: (1) "Williams may have become an informant shortly before the July 13 stop,"[4] and thus the information he gave lacks sufficient indicia of reliability to support a finding of reasonable suspicion; and (2) Williams' information was not corroborated.

_____

[4] The record does not support this assertion, but for purposes of discussion, the Court assumes that it does.

(Def. Mot. at 6). Harris also implies that Adams was unreliable because he was a confessed thief.

Taken together, the information provided by Adams and Williams provided reasonable suspicion to support an investigatory stop. Adams provided information that linked Harris to the theft of weapons from Adams a few days before the stop. (Hrg. Tr. at 9). In so doing, Adams acted against his penal interest by confessing that he had committed a burglary and stolen the weapons that Harris, in turn, stole from him. Adams' account was corroborated by Williams, who told police that he had seen Harris rob Adams of the weapons after the search of 404 Carolina Avenue on July 12.

Williams' statements that Harris would be arriving at 404 North Carolina Avenue on the afternoon of July 13 and that there would be a firearm in the car are also supported by independent indicia of reliability.

First, the officers knew Williams' identity and therefore could hold him accountable for any false or misleading information. See United States v. Christmas, 222 F.3d 141, 144 (4th Cir. 2000) (noting that "a witness who directly approaches a police officer can also be held accountable for false statements."). Although some of Williams' information came over the telephone, rather than face to face, Aponte had met with Williams in person just the day before and therefore had had the

16

opportunity "to assess [his] credibility and demeanor." Id. Furthermore, Williams clearly expected to meet with the police following the provision of the tip because he told the police that he would be in the car with Harris. The fact that Williams essentially resigned himself to a confrontational police encounter further supports his credibility.

Second, Williams specifically and accurately predicted that Harris would be arriving at 404 North Carolina Ave in the near future in a gray sedan. As noted above, accurate prediction of a suspect's future movement and location significantly bolsters an informant's reliability. See, e.g., United States v. Lawing, 703 F.3d 229, 237 (4th Cir. 2012) (finding confidential informant reliable where the defendant "drove the car that the CI said he would drive; [defendant] took the route that the CI said he would take; [and defendant] appeared at the time the CI said he would arrive, in a place close to the intended delivery address."). Although Williams was incorrect about the make of the car, that fact does not significantly undermine the accuracy of his prediction, given that the car that he described was a gray sedan and the car that was stopped also met that description.

Third, Williams and Harris had been placed together at the scene of a robbery involving firearms only days before by Stephan Adams. Thus, Williams' ties to Harris and to criminal

activity involving firearms had been independently corroborated by a third party. This supported the officers' belief that Williams had "a special familiarity with [Harris'] affairs and therefore had "access to reliable information about [Harris'] illegal activities." <u>White</u>, 496 U.S. at 332.

In sum, Williams' information had a "tendency to identify a determinate person," <u>i.e.</u>, Harris, and was "reliable in its assertion of illegality." <u>J.L.</u>, 529 U.S. at 271. Williams' information was corroborated by Adams and by innocent verifiable details such as location, car type and color, and the approximate time at which the car arrived at the specified location to pick up Williams. For all the foregoing reasons, the stop of the gray Infiniti was appropriate under <u>Terry</u> even if there was not a valid traffic violation (which, of course, there was).

It is true that, in the cases cited by Harris where reasonable suspicion was found to have been satisfied, the informants had a more extensive history dealing with police than Adams and Williams did here. But, here, the information supplied was corroborated by independent evidence, and there is no rule that a longer history weighs more than corroboration. Nor should there be. And, tellingly, Harris has not cited any authority in which an informant who gave accurate predictive information, was known to the police, and had been identified as

an associate of the defendant was found to be unreliable.  Thus,
the distinctions that Harris seeks to make are not persuasive,
and the initial stop of the Infiniti was lawful under _Terry_.

**B.   Standing:   The Issue of Abandonment; The Seizure of the
      Phone (July 13); and the Search Pursuant to the September 4
      Warrant**

    **1.   General   Principles   Applicable   to   Standing   and
          Abandonment**

The Government contends that Harris "forfeited any standing
he had to contest the constitutionality of" the search or
seizure of the cell phone when, on July 20, he denied ownership
of the phone in response to Aponte's request for the password.
(Gov. Resp. at 10).   Harris takes the position that he did not
abandon the phone because he claimed it as his when he
identified the phone at the scene of the traffic stop on July
13and when he asked Aponte to return the phone later that day.
According to Harris, he had a legitimate expectation of privacy
in the phone at all times thereafter.   (Defendant's Reply to
Government Response to Defendant's Motion to Suppress Illegally
Seized Evidence ("Def. Reply," ECF No. 21) at 3).   According to
Harris, because the phone was illegally seized on July 13, and
Harris' disclaimer on July 20 was related to that seizure, the
disclaimer is legally ineffective.   (Hrg. Tr. at 174).

The settled principles guiding the analyses are not in
dispute.   As a prerequisite to having evidence excluded on

19

Fourth Amendment grounds, defendants bear the burden of establishing the existence of a reasonable expectation of privacy in the property that has been searched or seized. Rawlings v. Kentucky, 448 U.S. 98, 104 (1980). "This includes the obligation of demonstrating, where the Government reasonably contests their claim, that their expectation of privacy existed contemporaneously with the particular search or seizure at issue." United States v. Gerena, 662 F. Supp. 1265, 1269 (D. Conn. 1987) (internal citations omitted). This requirement follows directly from the principle that only a defendant whose possessory or privacy interests have been interfered with by a search or seizure is entitled to seek the protection of the exclusionary rule. Rakas v. Illinois, 439 U.S. 128, 134 (1978).

A necessary corollary to that principle is the rule that, "when a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it." United States v. Stevenson, 396 F.3d 538, 546 (4th Cir. 2005); see also California v. Hodari D., 499 U.S. 621, 629 (1991) (finding no reasonable expectation of privacy in containers or contraband dropped or abandoned by a suspect fleeing from law enforcement officials); United States v. Cofield, 272 F.3d 1303, 1305 (11th Cir. 2001) (noting that "an individual who abandons or denies ownership of personal

20

property may not contest the constitutionality of its subsequent acquisition by the police."); United States v. James, 353 F.3d 606, 616 (8th Cir. 2003); United States v. Roman, 849 F.2d 920, 922 (5th Cir. 1988).

However, "the government cannot rely on any intention to abandon the [property] that the defendant may have formed after the search and seizure occurred, to justify the prior search and seizure. It is the status of the property at the time of the search and seizure that is controlling." United States v. Olsen, 245 F. Supp. 641, 645 (D. Minn. 1965) (emphasis added).

The government bears the burden of proving that the defendant voluntarily abandoned the property. Id.; United States v. Fulani, 368 F.3d 351, 354 (3d Cir. 2004). Intent to voluntarily abandon may be inferred from "words spoken, acts done, and other objective facts." United States v. Thomas, 864 F.2d 843, 846 (D.C. Cir. 1989) (quoting United States v. Colbert, 474 F.2d 174, 176 (5th Cir. 1973)).

"An abandonment may be involuntary, and thus invalid, where it results directly from police misconduct, such as an illegal search or seizure, deceit, or, perhaps, a pattern of harassment." United States v. Lewis, 921 F.2d 1294, 1302 (D.C. Cir. 1990). Likewise, abandonment coerced by the police is of no effect. However, "[a]n abandonment that occurs in response to proper police activity has not been coerced in violation of

the Fourth Amendment." United States v. Miller, 974 F.2d 953, 958 (8th Cir. 1992) (internal citation omitted).

The Fourth Circuit also has further instructed that, whether or not the defendant initially claimed ownership of an item, some evidence of coercion is necessary to render a later abandonment "involuntary." United States v. Han, 74 F.3d 537 (4th Cir. 1996). In Han, agents encountered the defendant sitting with a travel bag at his feet during their search of a third-party's residence. An agent "asked if he could move the bag for safety purposes, and Han agreed; a sheriff's deputy moved it out of Han's reach." Id. at 540. Shortly thereafter, the agent asked Han for permission to look into the bag at which time Han responded that it was not his bag. The agent then asked if Han "had a problem" with the agent looking inside the bag, and Han said that he did not. Id. The agent found heroin and a wallet containing Han's identifying information in the bag.

On appeal, Han argued that his denial of ownership was ineffective, for two reasons. First, he argued that the denial did not constitute abandonment because "he thought that claiming ownership would incriminate him." Id. at 544. Second, he "note[d] that he initially implied that he owned the bag—by responding affirmatively when the officers asked if they could move 'his' bag—and that Orton confirmed Han's ownership by

22

talking to Bennett." Id. at 544. Han contended that, "even if disclaimer generally constitutes abandonment...it does not when the police know who owns the property but ask repeatedly in order to circumvent the warrant requirement." Id. at 545. The Fourth Circuit rejected both arguments.

First, the Court of Appeals held that "a disclaimer of ownership is not rendered ineffective merely because the defendant was trying to avoid incriminating himself." Id. at 544. As did Han, Harris asserts that, on July 20, he feared that a claim of ownership might incriminate him and that his disclaimer should be of no effect. For the same reasons set forth by the Fourth Circuit in Han, that argument is rejected here.

Second, the Court of Appeals held that:

> [t]ruly repetitive questioning [regarding ownership] might be coercive in particular circumstances, but there was no coercion in this case...Moreover, whether the officers knew that Han owned the bag is irrelevant. The constitutional property right belonged to Han, and his abandonment of that right did not depend on whether the officers knew that it existed.

Id. (emphasis added).

The foregoing principles make it necessary first to address whether Harris has standing to challenge the seizure of the cell phone on July 13, and if so, whether that seizure was lawful. Then, it will be appropriate to decide whether Harris has

standing to address the search of the phone's contents pursuant
to the September 4 warrant.  If Harris does have standing, then
it will be necessary to decide whether that search was lawful.

> **2.  Standing to Contest the July 13 Seizure of the Cell Phone**

The record establishes that, at the time of the stop on
July 13, and again later that same day following the seizure,
Harris affirmatively claimed the Samsung cell phone as his.
(Gov. Resp. at 6).  Aponte's search warrant affidavit reiterates
that, "[w]hile on the scene of the traffic stop, Marcus Harris
stated that a cell phone Samsung S4 touch screen bearing IMEI
number 990004951738859 was his property."  (ECF No. 14-2 at 5).
Thus, at that time, Harris had a reasonable expectation of
privacy in the phone, and the Government cannot offer Harris'
subsequent abandonment on July 20 as justification for the
seizure that had already occurred.  Therefore, Harris has
standing to challenge the seizure of the cell phone on July 13.

> **3.  Standing to Contest the Search of the Phone Pursuant to the September 4 Warrant**

That leaves for resolution whether Harris has standing to
challenge the search of the cell phone pursuant to the warrant
issued on September 4.  The standing issue as to that search
(which yielded the evidence that is sought to be suppressed)[5] is

---

[5] There was a search warrant issued on July 14 (ECF No. 14-1)
and, on July 16, there was an effort to search the cell phone

24

presented as an issue of abandonment of any possessory interest or expectation of privacy.

The record is clear that, when Aponte came to Harris' house on July 20, Harris manifested an unequivocal intent to abandon the phone. The undisputed evidence shows that, on that date, Aponte asked Harris to provide the password for the phone, to which Harris responded that the phone was not his. (Hrg. Tr. at 115). In addition to his express, unsolicited statement to Aponte on July 20 that the phone did not belong to him, Harris did not thereafter seek the return of his phone before the September 4 warrant was issued.

Moreover, Aponte's questioning of Harris on July 20 was not in any way "coercive" and thus Harris' abandonment was voluntary. Aponte merely asked Harris for the password to his phone when Harris shifted the topic and denied ownership of the phone. Furthermore, Han teaches that it is irrelevant to the question of abandonment that Harris previously had claimed ownership of the phone and that Aponte knew that Harris owned the phone even when Harris later disclaimed ownership.

As noted above, however, where "the purported abandonment of the [item] by [the defendant] occurred after he had been

---

pursuant to that warrant. However, that effort was unsuccessful and thus there is nothing to be suppressed. Accordingly, it is not necessary to discuss standing to challenge that attempted search.

illegally seized," and the abandonment is "clearly the direct result of the illegal seizure," the abandonment does not negate the illegality of the seizure, and accordingly, the fruits of the illegal seizure must be suppressed. <u>United States v. Wilson</u>, 953 F.3d 116, 127 (4th Cir. 1991). Therefore, given the undisputed evidence of abandonment and the undisputed evidence that the cell phone was seized on July 13 to secure it pending application for a search warrant, the dispositive question becomes: was Harris' abandonment of the phone on July 20 a "direct result" of an illegal seizure on July 13? Harris contends that the seizure was unlawful. To that contention, we now turn.

**4.   Police Legally Seized Harris' Cell Phone on July 13**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Warrantless seizures are "per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." <u>United States v. Ross</u>, 456 U.S. 798, 825 (1982) (internal citation and quotation marks omitted). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interest in that property." <u>United States v. Jacobsen</u>, 466 U.S. 109, 113 (1984).

The Government does not dispute that a seizure occurred, but takes the view that it was reasonable under the circumstances to seize Harris' telephone pending application for a warrant to search the contents of the phone. In so doing, the Government invokes the exigent circumstances exception to the Fourth Amendment.

The "exigent circumstances" exception to the warrant requirement allows police to bypass the warrant requirement when "the exigencies of the situation make the needs of law enforcement so compelling" that a warrantless search or seizure becomes reasonable. Kentucky v. King, 563 U.S. 452, 459 (2011). This exception most commonly applies when a law enforcement officer reasonably apprehends that "the evidence might be destroyed before a search warrant could be obtained." United States v. Grissett, 925 F.2d 776, 778 (4th Cir. 1991). To prevail on the application of this exception, the Government must show that: (1) the officer had probable cause to believe that Harris' phone contained evidence of a crime; and (2) the officer reasonably believed that the evidence would be destroyed or removed before a warrant could be secured. United States v. Cephas, 254 F.3d 488, 494 (4th Cir. 2001) (citing United States v. Turner, 650 F.2d 526, 528 (4th Cir. 1981)).

Harris does not challenge the Government's contention that, absent seizure, Aponte reasonably believed that the contents of

Harris' cell phone could have been deleted (either remotely or if the phone was in Harris' possession) or that the phone could have been destroyed or thrown away. In other words, Harris concedes the second facet of the exigent circumstances exception. And wisely so, because the undisputed record proves the point, and the decisional law[6] fully supports such a finding.

Instead, Harris contends that there was not probable cause to believe that the telephone contained evidence. (Hrg. Tr. at 149-153). Probable cause means that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Probable cause must be assessed from the "standpoint of an objectively reasonable officer." Ornelas v. United States, 517 U.S. 690, 696 (1996). And, when making that determination, courts are to take into account the specialized knowledge and experience of law enforcement officers. See, e.g., United States v. Wellman, 663 F.3d 224, 229 (4th Cir. 2011). Like all

---

[6] See, e.g., United States v. Lewis, 2015 WL 1884375, at *5 (W.D. Ky. Apr. 24, 2015) (finding that "law enforcement had a reasonable belief that evidence on the cell phone would be destroyed if they did not seize it"); United States v. Santillan, 571 F. Supp. 2d 1093, 1101 (D. Ariz. 2008); see also United States v. Bradley, 488 F. App'x 99 (6th Cir. 2012) (warrantless seizure of laptop justified to prevent either computer or contents from being damaged or destroyed); United States v. Brown, 701 F.3d 120, 127 (4th Cir. 2012) (same); United States v. Clutter, 674 F.3d 980, 984 (8th Cir. 2012) (same); United States v. Mitchell, 565 F.3d 1347, 1350 (11th Cir. 2009) (same).

Fourth Amendment analyses, the totality of the circumstances frames the inquiry.

A number of decisions have concluded that probable cause to search a cell phone exists simply because cell phones discovered in proximity to crime or contraband almost invariably contain incriminating evidence. See, e.g., United States v. Pineda, 999 F. Supp. 2d 982, 989 (M.D. Tenn. 2014) (finding that, "[u]pon finding drugs on the Defendant's person, officer's [sic] had probable cause to seize the Defendant's cell phone and to search the vehicle that the Defendants drove to the residence [where a search warrant was being executed]."); United States v. Reed, 2013 WL 5503691 (D. Vt. Oct. 2, 2013) (finding that probable cause existed to seize cell phones even though phones were not mentioned in search warrant for defendant's home because digital devices often contain contact information for criminal associates, and "phones could also contain other information, including photographs, that [the law enforcement agent] knew controlled substance traffickers usually maintain at their residence or place of business."); United States v. Abgodjan, 871 F. Supp. 2d 95, 101 (N.D.N.Y. 2012) (finding probable cause existed to seize defendant's phones because officer knew that a computer had been used in reshipping scam (specifically for email, chat messaging, and instant messaging), and "also knew from experience that other electronic devices are used

29

interchangeably with computers"). These decisions are pertinent here, not because of the legal proposition on which they are based, but because they reflect factual findings that are consistent with the experience of the law enforcement officers as set out in this record.

Several courts have found that probable cause existed to justify the issuance of a search warrant based solely on law enforcement experience that cell phones found near illegal activity are highly likely to contain incriminating evidence. See, e.g., United States v. Fisher, 2015 WL 1862329 (D. Md. Apr. 22, 2015), appeal filed, Case No. 15-4471 (4th Cir. Aug. 10, 2015) (finding probable cause to search a cell phone that was found in a car where drugs were also found, because "cell phones...are acknowledged tools of drug traffickers"); United States v. Herevia, 2014 WL 4784321, at *8 (D. Md. Sept. 23, 2014) (affidavit was supported by probable cause because based on the law enforcement officer's experience, "drug traffickers often communicate about their business through cell phones"); United States v. Doe, 2013 WL 4212400 (W.D.N.C. Aug. 14, 2013) (finding that, due to "the plethora of offenses the Camry's occupants allegedly committed in the presence of [law enforcement]...it is not an imaginary stretch to believe that the Defendant's cell phone might contain incriminating evidence in image form, as photographs or movies, documenting the firearm

30

or the stolen property for purposes of sale," as well as "incriminating evidence in written form, as texts or emails, documenting correspondence between the Defendant and others...offering for sale the gun or the stolen property"); United States v. Reynolds, 2009 WL 1588413, at *2 (E.D. Tenn. June 4, 2009) (affidavit stating that defendant was in possession of 5,200 grams of marijuana and five cell phones, coupled with officer's belief that cell phones would contain evidence, created probable cause to support issuance of search warrant).[7]

Several courts have also found that cell phones are such common and integral tools of the criminal trade that their incriminating nature is immediately apparent and therefore their seizure falls within the plain view exception to the warrant requirement, particularly where the phones are found in close

---

[7] But see Matter of the Search of Apple iPhone, 31 F. Supp. 3d 159 (D.D.C. 2014) (federal magistrate denied government's application for cell phone search warrant because of concerns of "overseizure of data for which there [is] no probable cause," and government failed to specify a search protocol that would limit search and seizure to only data within the scope of the warrant, given that "sophisticated search tools exist...[to] allow the government to find specific data without having to examine every file on a hard drive"); In re Search of Certain Cell Phones, 541 F. Supp. 2d 1 (D.D.C. 2008) (federal magistrate denied government's application for cell phone search warrant, because although defendants "were in the garage where the drugs [were] found, I am not ready to conclude that there is, ipso facto, a reasonable likelihood that they have used their cell phones to sell drugs, thus justifying the search of [the phones'] entire contents").

proximity to drugs.   See, e.g., United States v. Hammett, 2014
WL 642501, at *1-2 (2d Cir. Feb. 20, 2014) (summary order)
(holding that cell phones are "tools that drug dealers often
possess" and upholding seizure of two cell phones under plain
view exception when discovered in an open bag containing a
digital scale); United States v. Diaz, 494 F.3d 221, 226 (1st
Cir. 2007); United States v. Key, -- F. Supp. 3d --, 2016 WL
454323, at *2 (N.D. Ill. Feb. 5, 2016) (observing that, even
though the officer "merely concluded that the phones were
relevant because they were relevant in previous investigations
of prostitution," testimony "allow[ed] the factfinder to make
the reasonable inferences necessary to link the phones to
prostitution and to the specific prostitution of this victim");
Lewis, 2015 WL 1884375, at *4; United States v. Simmonds, 2014
WL 1706296, at *8 (D. Vt. Apr. 29, 2014) (agents had probable
cause to seize cell phone that was "located in close proximity
to $4,503 in U.S. currency and an approximately three gram rock
of crack cocaine[, and] cell phones are generally recognized as
tools of the illegal drug dealing trade").[8]  These decisions are

---

[8] But see United States v. Jackson, -- F. Supp. 3d --, 2014 WL
10919597, at *9 (S.D. Fla. Apr. 16, 2014) (suppressing cell
phone evidence because "no evidence or testimony points the
[sic] incriminating nature of the cellphones, in light of the
offenses for which the officers had probable cause at the time,"
namely, possession of marijuana and fraud); United States v.
Gonzales-Barrera, 288 F. Supp. 2d 1041, 1053 n.4 (D. Ariz. 2003)

also pertinent because they provide credible support for the testimony of the officers in this case respecting their training and experience as to the probability of finding discriminatory evidence on Harris' cell phone, which was proximate to drugs, a digital scale, and weapons matching the description of those involved in two recent robberies.

Harris takes the view that the foregoing authorities are of no effect because of the decision of the Supreme Court of the United States in Riley v. California, 134 S. Ct. 2473 (2014), which Harris reads to require direct evidence, beyond an officer's training and experience, to create probable cause to seize a cell phone. Specifically, Harris relies on the Supreme Court's observation that "allowing a warrantless search of an arrestee's cell phone whenever it is reasonable to believe that the phone contains evidence of the crime of arrest" would "prove no practical limit at all when it comes to cell phone searches." Id. at 2492. Harris' argument fails for two reasons. First, it relies on text that pertains to a warrantless search of a cell phone's contents incident to arrest, not to a seizure pending application for a search warrant, as was the case here. Second, the argument fails because it simply ignores the Supreme Court's point that, although a warrant is needed to search a cell phone

(noting that incriminating nature of cell phones was "not facially evident").

following a suspect's arrest, "officers could have seized and secured [the defendants'] cell phones to prevent destruction of evidence while seeking a warrant." Riley, 134 S. Ct. at 2486.

Hence, the important issue here is whether there was probable cause to seize Harris' cell phone. That is, the Court must determine whether, considering the totality of the circumstances, a reasonable officer would have believed that there was a fair probability that the phone contained evidence of a crime. Gates, 462 U.S. at 238. If so, Aponte was permitted to seize the cell phone "to prevent destruction of evidence while seeking a warrant." Riley, 134 S. Ct. at 2486. On that score, the record supports the Government.

At the time Aponte declined to return Harris' cell phone on the afternoon of July 13, Aponte knew (based on information obtained from Adams and Williams) that, on or about July 7, Harris had stolen three weapons and a wallet from Adams at gunpoint. (Hrg. Tr. at 39-40; 96). The stolen guns included a Glock semiautomatic pistol and a revolver. Id. at 96. Aponte had also learned from Williams and from the consensual search of the vehicle that Harris was in the vehicle with a Glock, ammunition, a revolver, and drugs. Id. at 83-86; 94-96; 127-28. Aponte knew from Finch-Howard that, in the car, Harris had been in possession of the fanny pack containing the Glock, but threw it into the back seat of the vehicle when McCall turned on his

34

emergency lights.   Id. at 107.   Finch-Howard had also told Johnson that there was a video on Harris' phone of Harris shooting one of the stolen firearms.   Id. at 38.   Johnson then told Aponte that he would find a video on the telephone.[9]   Id. at 147.

Moreover, both Johnson and Aponte had training and experience teaching that suspects often used their cell phone cameras to take so-called "glamour shots" or "trophy photos," which depict suspects with the yield of their criminal activity. Id. at 27-28; 108-09.   Aponte had encountered similar photos of both weapons and drugs on suspects' cell phones in previous investigations.   Id. at 109.   And, he was aware of other officers in the PBP who had similar experiences.   Id. at 108-09.

In light of the totality of the circumstances, at the time Aponte refused to return Harris' phone, Aponte clearly had probable cause to arrest Harris for possession of the drugs and three firearms found in the vehicle.   The record also shows that there was a fair probability that the cell phone contained evidence relevant to those crimes.   And, it shows that there was a strong likelihood that a warrant would be issued to allow search of the contents of the phone for such evidence.   As in Riley, law enforcement officers were warranted in seizing and

---

[9] Aponte recalled only that Johnson said that there would be a video on the phone.   He did not recall hearing that the video would show Harris shooting a stolen firearm.

holding the phone while they sought permission to search the phone by obtaining a search warrant.

For the foregoing reasons, Harris' argument that his phone was unlawfully seized fails. And, that failure disposes of the only challenge to the search of his phone that he has standing to make, because on July 20, Harris abandoned the privacy interest that would entitle him to challenge the search of the contents of the phone pursuant to the search warrant issued on September 4.[10]

### CONCLUSION

For the foregoing reasons, the MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE (ECF No. 14) was denied.

It is so ORDERED.

/s/          REP
_____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April _8_, 2016

---

[10] At the end of the March 7 evidentiary hearing, Harris reiterated his contention that the evidence in the record was sufficient to animate the analysis required by Franks v. Delaware, 438 U.S. 154 (1978). (Hrg. Tr. at 157). However, for the reasons set forth above, Harris lacks standing to challenge the September 4 search warrant. Furthermore, the search conducted pursuant to the July 14 warrant was unsuccessful, and therefore the Government is not seeking to introduce any evidence obtained as a result of that warrant. Accordingly, no Franks analysis is necessary for either warrant.